UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

KATHLEEN BROOKS,

        Plaintiff,

v.                                                  Case No. 06-C-996

GENERAL CASUALTY COMPANY
OF WISCONSIN, et al.,

        Defendants.

**DECISION AND ORDER**

This case arises out of an explosion and resulting fatalities that occurred at the Cedar Grove Resort in Ellison Bay, Wisconsin. Several motions are currently pending requiring the resolution of a single question of law: was the Cedar Grove Resort "required to be a member of the one-call system," as set forth in Wis. Stat. § 182.0175? For the reasons set forth below, I conclude it was not required to register with the one-call system. It therefore follows that Cedar Grove's motion for partial summary judgment dismissing the claims against it based on the statute will be granted and the motion seeking partial summary judgment against it will be denied.[1] In addition, several defendants have moved to exclude certain opinions offered by one of the plaintiffs' experts. That motion will be granted.

---

[1] It seems more economical to proceed with analysis of this question rather than address Arby's motion for judgment on the pleadings. Essentially, the motion for judgment on the pleadings seeks a ruling that assumes Cedar Grove Resort *was* required to register with the one-call system. That very question, however, has been brought into dispute by virtue of the subsequent motions for partial summary judgment. Accordingly, because I conclude Cedar Grove was not required to register with the one-call system, the motion for judgment on the pleadings will be denied.

**I. Background**

The underlying facts have been set forth in previous decisions. For present purposes, it is enough to say that the current dispute arises from the existence of an underground propane line that defendant Cedar Grove Resort, Inc. ("Cedar Grove") had installed on its property several years ago. The propane system was installed on land to which Cedar Grove had title, although a portion of the underground lines ran underneath Cedar Road (also known as Cedar Shore Road), a road that bisected Cedar Grove's property. The propane system was not registered with Diggers Hotline.

In 2006, Arby Construction, Inc. ("Arby") was retained to work on an excavation project at the resort. Prior to beginning its work underground, Arby notified Diggers Hotline of its intent to dig, and several transmission facilities owners marked the location of their facilities. There is some dispute about what other actions Arby may have taken to investigate the existence of any other underground systems. In any event, Arby evidently struck the unmarked propane line while working on July 7, 2006, although it did not realize it at the time. Three days later, a large explosion at the resort resulted in significant damage, injuries, and two deaths.

**II. Motions for Partial Summary Judgment**

At issue presently is the plaintiffs' claim that the explosion was caused, among other things, by the resort's failure to register with Diggers Hotline, the state's "one-call" system. Created pursuant to Wis. Stat. § 182.0175, the system is designed to publicize excavating and drilling projects so that owners of underground facilities can mark them before the excavation begins. If a facilities owner governed by the statute fails to register with the one-call system, he "is liable for all damages to the owner's transmission facilities and for any other damages that occur as a result of a properly noticed excavation to the one-call system." Wis. Stat. § 182.0175(c).

2

In the typical case, an excavator calls Diggers Hotline at least three business days in advance of its dig. The Hotline then informs the owners of transmission facilities, such as utility companies, and they are responsible for marking their lines. These transmission facilities owners are required to be a part of the system by virtue of § 182.0175(1m)(b)(1), *infra*.

The process is different, however, for private facilities. Under the statute, an individual or business who owns a private underground transmission facility is exempted from membership in the one-call system. As the Diggers Hotline website explains to potential excavators:

> A private facility is a facility that is not owned by a utility or other member of Diggers Hotline; they are owned by homeowners or private businesses who are not required to be members of Diggers Hotline and will not be notified of your intent to dig. As a result, these lines will not be marked after a locate request is processed. Examples of private facilities include propane, electric, gas and/or communications facilities owned by a business or homeowner. *It is the excavator's duty to notify the owners of private facilities of their intent to dig.*[2]

This private-public distinction finds its source in the key statutory language at issue in this case, an exemption for owners of private facilities: "A transmission facilities owner or lessee is not required to be a member of the one-call system if all of that person's transmission facilities are located on property owned or leased by that person. This subdivision does not apply to a governmental unit that is a transmission facilities owner." Wis. Stat. § 182.0175(1m)(b)(2).

Other applicable sections of the one-call statute are set forth below:

> (1)(c) "Transmission facilities" includes all pipes, pipelines, wires, cables, ducts, wirelines and associated facilities, whether underground or aboveground . . . . The term does not include any of the following:
> . . .
> 2. A fuel storage tank and a fuel storage pipeline, if the pipeline does not cross a public right-of-way and if the tank and pipeline are located on property that is owned or leased by the user of the tank and pipeline.

---

[2] "2007 Excavator Guide to Diggers Hotline," p.6, available at http://www.diggershotline.com/images/07man.pdf (italics in original).

3

> . . .
>
> (1m) One-call system. (a) Statewide system. Transmission facilities owners shall establish or designate a nonprofit organization governed by a board of directors as the operator of a one-call system. The one-call system shall be a statewide communication system in which a single operational center receives excavation notices and transmits notice information to affected-member transmission facilities owners.
>
> (b) Membership.
> 1. Except as provided in subd. 2., a transmission facilities owner shall be a member of the one-call system.
>
> 2. A transmission facilities owner or lessee is not required to be a member of the one-call system if all of that person's transmission facilities are located on property owned or leased by that person. This subdivision does not apply to a governmental unit that is a transmission facilities owner.
>
> . . .
>
> (c) Liability. Any transmission facilities owner who is required to be a member of the one-call system and has not complied with the membership requirement is liable for all damages to the owner's transmission facilities and for any other damages that occur as a result of a properly noticed excavation to the one-call system.

Wis. Stat. § 182.0175.

The question is whether Cedar Grove's facilities were private facilities that did not require registration with Diggers Hotline. Cedar Grove argues because it held title to all of the land above its facilities, it was not required to register: its "transmission facilities are located on property owned or leased by that person." Wis. Stat. § 182.0175(1m)(b)(2). Arby and the plaintiffs claim otherwise – in their view, the existence of propane lines underneath Cedar Road renders the propane system non-private and thus subject to registration. The motions for partial summary judgment thus pose a narrow question: under Wis. Stat. § 182.0175(1m)(b)(2), are transmission facilities "located on property owned or leased by" a transmission facilities owner when a portion of the facilities lie underneath a public road that crosses the owner's property? This is in essence a question of statutory interpretation.

4

Under Wisconsin law, "[t]he primary goal of statutory interpretation is to determine the legislature's intent." *Peters v. Menard, Inc.*, 224 Wis. 2d 174, 185, 589 N.W.2d 395 (1999). Of course, a legislature is a body of persons, not just one, and so to talk of it as having a single discernable intent is somewhat of a misnomer. Different members of the legislature may have different opinions, or no opinion, as to how a statute they enact should apply under the circumstances of a particular case. The assumption that there exists a common understanding or intent as to the meaning of a particular provision, especially if the language at issue was part of a complex bill that was the result of the kind of compromise and give-and-take that are inherent in the legislative process, is questionable at best. Unless anchored to the language of the statute, the search for legislative intent can also become an invitation to judicial lawmaking. Thus, the search for legislative intent begins with the plain language of the statute, and unless that language is ambiguous, that is where it usually ends. *See State ex rel. Neelen v. Lucas*, 24 Wis.2d 262, 267, 128 N.W.2d 425, (1964) ("Primarily, however, the meaning must be read from the language chosen by the legislature, and the courts are not free to determine whether different provisions would have been enacted if the legislators had given some or greater attention to the application of the statute upon a particular set of facts."). When the meaning of the statute cannot be discerned from the language of the statute itself, resort is then made to extrinsic aids such as the statute's history, purpose, scope and context to discern the intent of the legislature. *Miller v. Wal-Mart Stores, Inc.*, 219 Wis.2d 250, 271, 580 N.W.2d 233 (1998).

All parties concerned agree that no Wisconsin court has had occasion to decide the question presented here, and thus the question is one of first impression. Cedar Grove argues that it "owns" all of the property in what might be called the traditional sense; that is, it holds title to all of the land

5

in which the propane lines run. The fact that a road happens to cross over part of the lines merely means the public has a right-of-way – it does not mean Cedar Grove does not "own" that land. Arby and the plaintiffs take a more functional approach. They argue that the statute's reference to ownership is not linked so much to title as it is to *control* of the property in question.

Cedar Grove cites Wisconsin cases dating back a century which hold that individuals "own" land even when a road exists on it:

> By a long line of decisions in this state with reference to streets and roads it has become the settled law of this state that in the case of a road or street, whether acquired by condemnation, conveyance, by common-law dedication or by statutory dedication, the city, town, or village takes only an easement for highway purposes, while the fee is held by the abutting landowner.

*Thorndike v. City of Milwaukee,* 143 Wis. 1, 15, 126 N.W. 881, 886 (Wis. 1910).

> In the absence of a statute expressly providing for the acquisition of the fee, or of a deed from the owner expressly conveying the fee, when a highway is established by dedication or prescription, or by the direct action of the public authorities, the public acquires merely an easement of passage, the fee title remaining in the landowners.

*Walker v. Green Lake County,* 269 Wis. 103, 111, 69 N.W.2d 252, 257 (Wis. 1955) (quoting 25 Am.Jur., Highways, p. 426, sec. 132).

The plaintiffs and Arby offer some debate on this principle, and all sides spend a significant amount of effort discussing the effect of testimony and conclusions reached in a state court case involving the width of Cedar Road. Ultimately, however, there is no dispute that Cedar Grove has title to the entire property in question and that Cedar Grove does "own" the land, at least in the traditional sense that it has a fee interest in it. The fact that a right-of-way exists does not disrupt Cedar Grove's title to the property any more than does an easement for a foot path or railroad tracks. If the pertinent authorities decided to move the road elsewhere, the right-of-way could lapse and allow Cedar Grove full use of its land again.

6

The real question is whether the statute was using the term "property owned by" in the sense of ownership of title described above, or whether instead it could have been using the term "owned" in another sense altogether. As the parties opposing Cedar Grove argue, it is something of a stretch of common parlance to suggest that Cedar Grove "owns" the public road that runs through its property. The concept of ownership finds its true meaning, they posit, not in some abstract notion of fee interests but in the right to control a given parcel of land. The truest sense of ownership is the right to *exclude*, and it is clear that Cedar Grove has no control over the comings and goings of the public on Cedar Road. Notably, the statute exempts facilities on land that is "owned *or leased,*" suggesting perhaps that the statute is not so much concerned with title to the land but who controls the use of that land. Moreover, the statute's purpose was to protect the unsuspecting public from unknown underground facilities, and if such facilities crossed a public right of way they could be subject to rupture beneath that right-of-way without the input or involvement of the actual owner of that property.

While tying the concept of ownership to control has some attraction – and perhaps it makes sense as a matter of policy – I am not persuaded that the statute should be read in the more narrow sense suggested by Arby and the plaintiffs. In their view ownership of property is fundamentally inconsistent with the existence of a public right-of-way on that property, but it seems clear that the statute's authors would disagree. Indeed, reference to other parts of the statute reveals that the drafters *did* consider the question of public rights-of-way when they drafted the one-call statute, yet they considered that issue distinct from the question of property ownership. As set forth earlier, in § (1)(c), the statute defines "transmission facilities" as "all pipes, pipelines, wires, cables, ducts, wirelines and associated facilities, whether underground or aboveground . . ." but then excludes

7

from that definition "[a] fuel storage tank and a fuel storage pipeline, *if the pipeline does not cross a public right-of-way <u>and</u>* if the tank and pipeline are located on *property that is owned* or leased by the user of the tank and pipeline." Wis. Stat. § 182.0175(1)(c) (emphasis added). Thus, to be excluded from the definition of "transmission facilities," pipelines must (1) be located on property "owned" by their user and (2) *not* cross a public right of way.

Two things stand out about the definition of "transmission facilities" in § (1)(c). First, the exclusion described above imposes a condition *in addition to* mere property ownership: to qualify for exclusion, the lines must not only be on property owned by the user, they must also not cross any public right-of-way. If the drafters believed that "owned" property meant the same thing as "property not subject to any right-of-way," they would not have added that redundant condition to the exemption. Instead, it is clear that the statute, in § (1)(c), explicitly considers the possibility that a given piece of property (such as Cedar Grove's) could be "owned" by the facilities user even though a public right-of-way exists above an underground line. Courts are to "construe a statute so that no part of it is surplusage, giving effect to all the words that are used," *Randy A.J. v. Norma I.J.,* 2004 WI 41, 270 Wis.2d 384, 400, 677 N.W.2d 630, 639 (Wis. 2004), and Arby's and the plaintiffs' construction of the statute would render the phrase "if the pipeline does not cross a public right-of-way" mere surplusage. The more reasonable construction of "owned," based on how it is used § (1)(c), is that property may be "owned" under § (1m)(b)(2) *even if* a public right-of-way crosses over part of the owned pipeline.

A second salient feature of the condition found in § (1)(c) – "if the pipeline does not cross a public right-of-way" – is its notable absence from the reporting exemption found in § (1m)(b)(2), the section at issue in this case: "A transmission facilities owner or lessee is not required to be a

8

member of the one-call system if all of that person's transmission facilities are located on property owned or leased by that person." Clearly, the drafters had rights-of-way in mind, as the clause appears in the statute only a few subsections earlier. If the legislature had intended to limit the reporting exclusion to those owners whose facilities did *not* cross rights-of-ways, the obvious way to do so would be to include the same clause they used in § (1)(c). Its absence in § (1m)(b)(2) seems glaring.[3]

In sum, § (1)(c) makes clear that the statute does not consider a right-of-way to be inconsistent with property ownership, and there is no plausible basis to conclude that ownership means something different in § (1m)(b)(2). In addition, it is clear that had the drafters wanted to incorporate a right-of-way requirement into the reporting exemption found in § (1m)(b)(2), they could easily have done so by reiterating the language from § (1)(c). It is not for this court to interpolate that important qualification into the statute under the guise of construing its meaning. Ultimately, the plaintiffs' and Arby's arguments suggest plausible reasons that the legislature should change the statute, but they do not provide any basis to construe the existing statute in the manner

---

[3] Arby has submitted, with its reply brief, legislative history suggesting that the statute is in the process of being amended to be consistent with Arby's interpretation. (Kastens Aff., Ex. A-C.) In particular, the statute will create a definition for "private transmission facilities" that incorporates the two requirements that the facilities be on land owned by the user *and* not cross any rights-of-way. Although I do not consider the descriptions of the current law by the Wisconsin Legislative Reference and Fiscal Bureaus as legislative history relevant to the question of what the statute *currently* says, the proposed amendment itself undermines Arby's argument in the same manner as the statute itself – even the new statute would consider "owned" land different from land not subject to any rights-of-way. Moreover, the fact that an amendment has been proposed to require owners of private transmission facilities that cross a public right-of-way to register suggests that the statute does not currently read as Arby and the plaintiffs urge.

9

they now suggest.[4] To do so would effectively impose strict liability on Cedar Grove for failing to perform an act that, at the time, the law did not require. This would not only ignore the plain meaning of the statute, it would also offend the principle of fundamental fairness embodied in the concept of due process. *See Martin v. Richards*, 192 Wis.2d 156, 201, 531 N.W.2d 70 (1995). For these reasons the interpretation of the statute urged by them must be rejected.

Of course, this is not to say that Cedar Grove did not have a duty to notify Arby of the existence of its underground propane line and, if found to have breached that duty, that it may not be found liable for the damages sustained by plaintiffs. But that duty arises, if at all, under the common law, and its breach, if any, would constitute negligence, a claim that is also asserted in plaintiffs' amended complaint. (Am. Compl. ¶¶139-44.) Here, I conclude only that Wis. Stat. § 182.075 does not apply to Cedar Grove and thus the claim that Cedar Grove is strictly liable under that statute for its failure to register must be dismissed. Accordingly, Cedar Grove's motion for partial summary judgment will be granted and Arby's will be denied.

**III. Motion to Exclude Testimony of Patrick Kennedy**

Also pending is Arby's motion to exclude the testimony of Patrick Kennedy, an expert in fire and explosion investigations retained by the plaintiffs. Defendant Portside Builders, Inc. (the

---

[4] Arby also suggests the court should adopt the definition of "owner" from a nearby statute, which reads: "'Owner' includes all individuals, partnerships, associations, or corporations having any title or interests in any property, right, easement and interest authorized and required to be taken under authority of ss. 182.30 to 182.48." Wis. Stat. § 182.31. Although there is no basis to adopt this definition (which is from an unrelated statute), even if I did the result would not change. This broad definition would result in Cedar Grove being the "owner" of the road because it has "any title or interests" in the property. Even if the municipality could *also* be an "owner" under this broad definition, that would not somehow make the registration exception inapplicable.

general contractor) has also joined the motion, and herein I will simply refer to Portside and Arby as the defendants.[5] The defendants concede that Kennedy is indeed expert in what might be called the empirical aspects of fires and explosions – for instance, in explaining how a propane leak might lead to an explosion. He has a bachelor's degree in fire and safety engineering technology and has investigated some 2,500 accidents in nearly fifty years. The defendants protest, however, Kennedy's attempt to give opinions on what are essentially matters of negligence and culpability. That is, Kennedy would testify not only that Arby's puncturing of the propane line caused the explosion – he opines about *why* Arby hit the line in the first place. Specifically, he concludes that Arby severed the line due to its failure to properly plan and supervise the excavation; its failure to investigate the sites of underground lines; and its failure to investigate whether it had struck a line while excavating. Ultimately, he believes Arby breached its duty to conduct a safe excavation. (Kennedy reaches similar conclusions with respect to defendant Portside Builders.)

The plaintiffs admit that Kennedy is not an expert in underground drilling, or in excavations in general. He does not claim to have expertise in supervising excavations or in excavation safety. Kennedy testified at his deposition, however, that he has investigated several incidents and knows, as a matter of common sense, that diggers should not hit gas lines when they haven't investigated where they are. His portfolio (he believes) includes analyzing who is responsible for an accident and trying to prevent the next one. NFPA 921, *Guide for Fire and Explosion Investigations,* a well-recognized industry document, holds that an investigator's job includes determining "responsibility" for the accident. (Antoine Aff., Ex. B.) Because assessing responsibility is fully within the bounds

---

[5] Both Arby and Portside also object to credibility opinions Kennedy might have, but the plaintiffs state that Kennedy will not be opining about his opinions as to anyone's credibility.

11

of any fire investigation, the plaintiffs argue that Kennedy is fully entitled to fault Arby and Portside for their pre- and post-drilling failures to plan and investigate.

"Responsibility" is a loaded term, however. Presumably, in any tragedy there are countless factors and human decisions that could be deemed "responsible" for the fateful moment. At some point in analyzing those lead-up events, however, an expert tasked with explaining the contours of that moment will exceed the scope of his expertise. For example, suppose that a structural building expert were asked to explain the collapse of the World Trade Center. We would expect him to offer opinions about how a fire caused by jet fuel might interact with steel, or how weakened support beams caused the structure to fail. No one, however, would expect him to opine that the buildings collapsed because of failed American policy toward Islamic terrorism, lax airport security or the absence of locks on airplane cockpits. These latter conclusions may indeed relate to "responsibility" for the collapse, yet they certainly are well outside the bailiwick of an engineering expert. Similarly, a fire expert asked to explain a fire might conclude, based on its origin, spread, and other potential sources, that it was caused by a child playing with matches. Even if based on common sense, however, the expert would not be allowed to lend his expertise in assessing "responsibility" for the fire by testifying that the child's parents were negligent for failing to plan where they kept matches or opining that the parents breached a duty to supervise their child.

In other words, to the extent such an expert is tasked with explaining "responsibility" for an event, his testimony is generally limited to physical and factual (empirical) aspects of the event, not aspects of legal culpability.[6] Kennedy's conclusions, of course, are not as far-afield as those in the

---

[6] Conceivably, a safety expert could be called to explain proper safety procedures and implicitly assign blame in that manner.

12

Case 1:06-cv-00996-WCG   Filed 02/13/08   Page 12 of 14   Document 491

above examples. In fact, in concluding that the explosion occurred due to the defendants' failures to investigate both before and after the propane line was severed, he is simply expressing an opinion about what seems an unimpeachable factual reality: had the defendants acted otherwise, the explosion would not have occurred. But it is not Kennedy's factual conclusions that cause the defendants to protest. Instead, it is that Kennedy's conclusions are accompanied by normative judgments about what Arby and Portside *should* have done. In other words, Kennedy's opinions are not limited to citing their acts and omissions as being actual causes of the explosion; in addition, Kennedy opines that the defendants breached *duties* they had to act otherwise and failed to meet the requisite standard of care.

Kennedy divines the source of these duties from the law – Wis. Stat. § 182.0175(2)(a) – his common sense, and certain "best practices" promulgated by a nonprofit organization called Common Ground Alliance. All of these sources reduce to the unremarkable notion that an excavator should look before he digs: as the statute puts it, "every excavator shall . . . take reasonable action to learn the location of any transmission facilities in and near the area where the excavation is to be conducted." Wis. Stat. § 182.0175(2)(a). The plaintiffs argue that Kennedy, as a fire expert who has "reviewed" the statute and other suggested practices, should be entitled to analyze these sources and testify about the defendants' failure to live up to them. Yet there is simply nothing in his area of expertise that would afford Kennedy any particular expertise in analyzing these extremely straightforward principles. He is simply not an expert in behavior or excavation safety, and the fact that he may testify about some aspects of "responsibility" for the fire does not grant him *carte blanche* to give opinions about any duties Arby or Portside may have had. Indeed, even if he had some level of expertise in the duties owed by excavators, the conclusion that

13

Arby breached various duties is ultimately a legal one, not a factual one. Assessing the cause of a fire is far different than assigning blame.[7]

**IV. Conclusion**

In sum, the motion for judgment on the pleadings [292] and motion for joinder [300] are **DENIED** because the one-call statute on which the motions are premised is inapplicable to defendant Cedar Grove. Cedar Grove's motion for partial summary judgment [363] is **GRANTED**, and all claims based on Wis. Stat. § 182.0175 are **DISMISSED**. Arby's [442] motion for partial summary judgment is **DENIED**. Arby's motion to exclude certain testimony [428] and Portside's motion for joinder [452] are **GRANTED**, and the plaintiffs' expert will not be allowed to testify about matters relating to the defendants' standard of care.

**SO ORDERED** this   13th   day of February, 2008.

>  s/ William C. Griesbach
> William C. Griesbach
> United States District Judge

---

[7] None of the cases cited by the plaintiffs stand for a contrary principle. For example, plaintiffs cite a case in which the court allowed a fire investigator to opine that the cause of a fire was a lamp or the lamp's cord, even though the expert was not an electrical engineer. *Westfield Ins. Co. v. J.C. Penney Corp.,* 466 F. Supp.2d 1086 (W. D. Wis. 2006). Yet that testimony had to do with a *fact* in issue – what the actual, physical cause of the fire was. The expert did not purport to assign blame by testifying that the homeowner or manufacturer had been negligent. Similarly, in *Baumholser v. Amax Coal Co.,* 630 F.2d 550, 551 (7th Cir. 1980), the debate was over the scope of a scientist's expertise as to a *factual* issue – i.e., whether a mine's blasting operations caused structural damage to the plaintiff's home. The geologist in that case was not purporting to testify that the defendant had been *negligent* – merely that its actions were the physical cause of the damage suffered. None of the other cases cited suggest that a scientific expert may testify about the sorts of standard of care issues that have arisen here.

14